# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

MICHELLE RANDALL NORRIS, :
                      :
       **Plaintiff,**       :
                      :      **CIVIL ACTION FILE NO.**
**v.**                     :      **1:16-CV-01132-AJB**
                      :
**NANCY A. BERRYHILL,**[1]   :
*Acting Commissioner of Social*   :
*Security*,                  :
                      :
       **Defendant.**     :

# O R D E R   A N D   O P I N I O N

Plaintiff Michelle Randall Norris brought this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her application for Disability Insurance Benefits ("DIB").[2]  The parties

--------

     [1]     On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.  Under the Federal Rules of Civil Procedure, Berryhill "is automatically substituted as a party."  Fed. R. Civ. P. 25(d).  The Clerk is hereby **DIRECTED** to amend the case style to reflect the substitution.

     [2]     Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.*, provides for supplemental security income ("SSI") for the disabled.  Title II of the Social Security Act provides for federal DIB.  42 U.S.C. § 401, *et seq.*  The relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v.*

consented to jurisdiction before the undersigned. (*See* Dkt. Entry dated 3/31/16). For the reasons set forth below, the undersigned **REVERSES** the final decision of the Commissioner.

## I.    *PROCEDURAL HISTORY*

Plaintiff filed an application for SSI on January 9, 2012, alleging disability commencing on January 1, 2009. [Record (hereinafter "R") 204].  Plaintiff later amended the alleged onset date to September 6, 2011.  [R196].  Plaintiff's application was denied initially and on reconsideration.  [R110, 121].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  [R148].  An evidentiary hearing was held on November 14, 2013.  [R55-101].  The ALJ issued a decision on May 16, 2014, denying Plaintiff's application on the ground that she had not been under a "disability" at any time through the date of the decision.  [R48].

---

*Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).  Title 42 U.S.C. § 1383(c)(3) renders the judicial provisions of 42 U.S.C. § 405(g) fully applicable to claims for Supplemental Security Income.  In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "Period of Disability," or to recover SSI. However, different statutes and regulations apply to each type of claim.  Many times parallel statutes and regulations exist for DIB and SSI claims.  Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims.

AO 72A
(Rev.8/8
2)

Plaintiff sought review by the Appeals Council and, on December 1, 2015, the Appeals Council notified Plaintiff that it had granted request for review and would issue a decision finding that Plaintiff is not entitled to benefits after considering any comments or new and material evidence submitted within 30 days. [R9]. Comments and additional evidence were admitted and considered. [R13 (citing Exs. 18B, 20E, 21E, 22E, 18F)]. Upon review, the Appeals Council agreed with the ALJ's findings at steps one through three and five, but did not adopt the ALJ's finding at step four, that Plaintiff could perform some of her past relevant work. [R10]. It also disagreed with the ALJ as to Plaintiff's alleged date of onset, noting that Plaintiff amended that date to be September 6, 2011. [R10]. Nonetheless, the Appeals Council found that Plaintiff was not disabled as she could perform a reduced range of light-exertional level work, given her age, ability to do unskilled work, and residual functional capacity ("RFC"). [R10].

Plaintiff then filed an action in this Court on April 7, 2016, seeking review of the Commissioner's decision. [Doc. 1-2]. The answer and transcript were filed on August 31, 2016. [Docs. 6-7]. On September 29, 2016, Plaintiff filed a brief in support of her petition for review of the Commissioner's decision, [Doc. 10], and on November 2, 2016, the Commissioner filed a response in support of the decision,

AO 72A
(Rev.8/8
2)

[Doc. 11], to which Plaintiff filed a reply, [Doc. 12]. The matter is now before the Court upon the administrative record, and the parties' pleadings and briefs,[3] and is accordingly ripe for review.

## II.  PLAINTIFF'S CONTENTIONS

As set forth in Plaintiff's brief, the issues to be decided are as follows:

1.  Whether, in assigning Plaintiff a light RFC, as defined by 20 CFR § 404.1567(b) that "requires a change of position among sitting, standing, and/or walking the way the job is typically performed[,]" the ALJ erred due to formulating a vague RFC.

2.  Whether substantial evidence supported the ALJ's reliance upon the vocational expert's ("VE") opinion when the VE's opinion conflicted with the *Dictionary of Occupational Titles* ("DOT"), and the ALJ did not resolve the conflict.

3.  Whether the ALJ applied an inappropriate standard to evaluate Plaintiff's credibility concerning her subjective complaints of pain and limitations in her daily activities.

[Docs. 10 at 1; 11 at 1].

---

[3]  Neither party requested oral argument.  (*See* Dkt.)

4

### III.    STATEMENT OF FACTS[4]

#### A.    Background

Plaintiff was born in July 1960 and therefore was 51 years old on the alleged onset date.  [R96].  Her date last insured for purposes of DIB was June 30, 2014.  [R222].  Plaintiff completed high school and one year of college and previously worked as a babysitter and bus driver.  [R239-40].  She alleges in her disability report that she stopped working on January 1, 2009 "because of my conditions(s)[.]"  [R239].  In her hearing, she testified that she last worked, driving a bus, on September 6, 2011, and stopped working because "pain started[.]"  [R66].  However, when the ALJ asked Plaintiff if she was terminated from that position, she affirmed, stating it was "because I had an accident and when I described to them that I was in pain they let me go."  [*Id.*].  Plaintiff initially alleged disability due to "back problems."  [R239].

#### B.    Lay Testimony

Plaintiff testified at the hearing before the ALJ that she lives alone in an apartment and receives income from her late husband's pension, which also covers her health insurance.  [R64].  She testified that she cared for her granddaughter in 2008.

---

[4]      In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal.  [*See* Docs. 10-12].

[R83]. Plaintiff testified that, after she was terminated from her last job in 2009, she applied for unemployment benefits but was ineligible to receive them because she had not worked long enough. [R66-67]. She has stopped looking for employment. [R67]. However, she searches online for "a home job or something . . . work from home job[.]" [R86].

Plaintiff smokes, and, while she has been advised to stop, she has not because of "nerves and frustration, pain[.]" [R67].

Plaintiff testified that she does not work because she has disc disease in her upper back and arthritis in her lower back that affect her ability to bend and pick things up. [R71]. She gets tingles in her hands due to her upper back problems, has neck pain, had carpal tunnel, and has osteoarthritis in her knee. [*Id.*]. Plaintiff further testified that her neck pain bothers her at night when she tries to go to sleep and when she wakes up in the morning. [R72]. She described this pain as a nine on a ten-scale, and described it like needles and "goes all the way down to my fingers." [*Id.*]. She testified that it is harder for her to walk and sit for long periods of time. [*Id.*]. Her back pain creates tingling and numbness in her legs from her lower back and described it as an eight of ten every day. [R72-73]. Her osteoarthritis was in her right knee and it creates constant pain when she stands, drives, or walks for long periods of time. [R73].

6

Plaintiff also testified that she only sleeps five to six hours at night because of pain in her lower and upper back. [R78]. She explained that, about three times a week, she needs to lie down during the day every twenty to thirty minutes. [R79].

Plaintiff testified that she has depression that began when her husband died in 2002 and her mother died in 2005, but that she did not seek help until 2012. [R81]. She also claimed that she has post-traumatic stress disorder ("PTSD") which began between 2008 and 2010 when she was involved in a shooting incident in California. [R81-82]. Plaintiff also has problems with alcohol dependence and drug abuse that began "when my mom passed away in 2005 and I went into a depression and I lost my home trying to, because of her death we didn't have enough money to pay everything." [R83-84]. Plaintiff testified that she has panic attacks, lasting less than a minute, once or twice a month if she hears something like loud music. [R87-88]. She also has crying spells twice a week that are triggered by thoughts of suicide and her late husband and mother. [R88].

Plaintiff testified that she receives treatment for her conditions at Kaiser, [R71], where she went once a week for behavioral health counseling in the six months prior to her hearing, [R80]. She claimed that she stopped using alcohol and illicit drugs two months before the hearing and has been in a substance abuse program at Kaiser.

7

[R84-85]. She had a relapse during her treatment because she "got depressed again and . . . was thinking about committing suicide." [R85].

Plaintiff testified that she takes medication for neck and back pain in the afternoon. [R72]. Plaintiff also testified that, for the three months preceding the hearing, she got monthly steroid shots for her back which relieve the pain for two weeks. [R73]. She takes Trazodone[5] and Citalopram[6] for her depression and PTSD. [R83]. She takes her medications as prescribed but experiences side effects such as drowsiness and sluggishness. [R78].

She came to the hearing with a cane and testified that she has been using it for the last 30 days after it was prescribed by Dr. Vick-Bope of Kaiser. [R64-65].

Plaintiff testified that, on an average day, after she awakens, she washes herself and tries to clean the house and go for a walk. [R79]. She can make her bed, [R81], but cannot vacuum, [*id.*], and needs help loading and unloading the dishwasher, mopping floors, and dusting. [*Id.*]. Plaintiff testified that she can sometimes fix dinner,

---

[5]     Trazodone is a serotonin modulator used to treat depression. MedlinePlus, Trazodone, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html (last visited 9/19/17).

[6]     Citalopram is a selective serotonin reuptake inhibitor that is often used to treat depression. http://www.webmd.com/drugs/2/drug-1701/citalopram-oral/details (last visited 9/19/2017).

8

unless it requires stooping to pick up pots, and that her daughter regularly comes by to check on her and assist.  [R75].  Plaintiff exercises by walking ten to fifteen minutes until she feels pain in her knee or lower back.  [*Id.*].  She also testified that she goes to the doctor, on average, once a week, [R79-80,] and drives herself, [R74].

Plaintiff goes to her neighbor's house to use her computer for an hour or less, [R79, 86], because she cannot afford a computer or anything that has computer capability, [R68].  Plaintiff testified that she socializes very little and sometimes has problems getting along with people because she is "mostly moody all the time."  [R85].  She testified that she likes to fish but cannot sit there long enough.  [*Id.*].

Plaintiff described a series of limitations.  She can stand only for thirty minutes, after which time she starts having pain and pressure.  [R68].  She can stand and walk for an hour in an eight-hour day, sit for an hour and a half in an eight-hour day, and can sit continuously for one hour before she needs to get up.  [R75].  She fell down at home about a month before the hearing.  [R76].  The heaviest item she can lift is a gallon of milk and she does not regularly lift things that heavy, but can carry "maybe under two pounds or less."  [*Id.*].  She has problems with overhead reaching and dropping things that are too heavy.  [R76-77].  Tingles in her fingers and arthritis in her hands made grasping difficult.  [R77].  She also denied being able to push and pull things, stating

AO 72A
(Rev.8/8
2)

that she cannot vacuum her apartment and has to elevate her legs because of her knee. [*Id.*]. She has problems with concentration, for example, she cannot concentrate on words to read and her vision gets blurry. [R86-87]. However, she can follow simple instructions. [R87].

### C. Medical Records

#### 1. *Consultative Exams*

On October 12, 2011, Dr. Frank E. Robinson performed a physical examination of Plaintiff and reviewed the history she recounted and medical records received from Good Shepard Clinic. [R320]. He concluded that Plaintiff did not require an assistive device, such as a cane, and had normal gait and range of motion in her hips, knees, ankles, feet, neck, back, shoulders, wrists and forearms, [R321-22], and normal grip and pinch strength in both hands, [R323].

On July 2, 2012, Dr. Robysina James performed a consultative examination. Plaintiff advised that she developed neck pain in 1997 while driving a bus in California due to repetitively needing to pull down on a pole in the bus. [R345]. Plaintiff claimed that she visited a neurologist at the time and had an MRI which revealed a bulging disc and narrowing of the C4-C5 disc space, that she was treated with pain medications and physical therapy, and that, prior to the relevant time period, she had no treatment since

10

AO 72A
(Rev.8/8
2)

2000. [*Id.*]. Plaintiff also claimed that the pain was confined to her neck, with no radiation to upper extremities, but that, if she tilted her head back, she felt tingling in both arms and hands. [*Id.*]. She denied numbness but stated that she slept with a cervical pillow to reduce the pain. [*Id.*].

Dr. James observed that Plaintiff had "no difficulty undressing or moving on and off the examination table." [R346]. Upon examination, Dr. James found that Plaintiff had reduced active and passive right lateral bending and extension of thirty and forty percent, respectively, in her neck. [R340]. Her exam revealed "no swelling, erythema, warmth, or masses" in the cervical spine, paravertebral or trapezius muscle spasm or tenderness" or "tenderness of spinous processes." [R346]. Dr. James observed that Plaintiff had normal range of motion in her hips, knees, ankles, and feet and noted that she had normal ambulation and did not require an assistive device such as a cane. [R345]. Plaintiff was assessed with grip and pinch strength of 5/5 in both hands. [R342]. Based upon the history that Plaintiff provided, her physical examination, x-ray reports, and information sent to her, Dr. James diagnosed Plaintiff with "neck pain" and stated that Plaintiff "would be expected to be limited in her ability to do repetitive lifting, overhead work, and climbing . . . limited in all activities that require constant turning and twisting of her head and neck." [R347].

11

AO 72A
(Rev.8/8
2)

###### 2. *Treatment Records for Carpal Tunnel Syndrome*

Plaintiff claims that she previously had carpal tunnel syndrome. [R71, 320, 402]. It is unclear from her accounts when this was, but she has alleged that she had surgery on both hands in 1999, [R515, 558], and only on the right hand in 2002, [R455]. Although Plaintiff complained of pain and weakness in both hands and history of carpal tunnel on October 16, 2012, [R455], a test of muscle strength by group revealed that her strength was 5/5 in both her wrist flex, fingers, and thumb abductions, [R458]. At her November 14, 2012 annual physical, Plaintiff was assessed with muscle strength of 3/5 in her right hand and a normal range of motion in the joints without pain or mechanical limitation. [R397, 399]. A January 2013 a physical exam revealed full range of motion in her elbows and wrists. [R367].

###### 3. *Treatment Records for Back, Neck, Leg, and Hip Pain*

On August 31, 2011, Plaintiff complained of lower back pain and left hip pain, but left her medical provider's office without being seen. [R325]. Her first reported attempt to seek treatment for pain during the relevant period was in September 2011 when she visited Southside Medical Center, [R299]. Treatment notes reflect that she

AO 72A
(Rev.8/8
2)

alleged left hip pain for the preceding four months and was prescribed Tramadol,[7]
Naprosyn,[8] and Flexeril.[9]  [*Id.*].  Her next claims of pain are from November 2011,
when she reported numbness and tingling in both hands and pain in her upper back that
improved upon laying down and the application of heat.  [R324].

A July 9, 2012 x-ray of Plaintiff's cervical spine revealed severe degenerative
disc disease at C3-C6 and straightening of the normal cervical lordosis.  [R339].  On
August 29, 2012, Plaintiff reported left lower back pain over the last several years and
left hip and right knee pain over the last two to three months.  [R409].  X-rays showed
mild degenerative arthritis of the lower back and right knee.  [R569].  However two x-
ray studies done four weeks before revealed normal hip x-rays.  [R409].  She was

---

[7]      Ultram (tramadol) is in a class of medications called opiate (narcotic)
analgesics and is used to relieve moderate to moderately severe pain.  MedlinePlus,
Tramadol,  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html  (last
visited 9/22/17).

[8]      Naprosyn (naproxen) is a nonsteroidal anti-inflammatory drug used to
relieve pain, tenderness, swelling, and stiffness.  MedlinePlus, Naproxen,
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html  (last  visited
9/22/17).

[9]      Flexiril (cyclobenzaprine) is a relaxant used for short-term of muscle
spasm. http://www.webmd.com/drugs/2/drug-11372/flexeril-oral/details (last visited
9/22/17).

13

diagnosed with chronic low back pain and knee joint pain and advised to apply heat and cold therapy and avoid lifting heavy things until the pain subsided. [R410].

On September 26, 2012, Plaintiff underwent an initial evaluation by Physiotherapy Associates. [R356]. Plaintiff reported lower back pain radiating into her left leg at a level of a seven out of ten. [*Id.*]. Objective examinations revealed that she was hypomobile[10]/painful in her left and right lumbar regions; had lower extremity strength of four out of five, tenderness along her left lumbar spine, and moderately limited range of motion in her spine's active lumbrosacral; that prone knee bends aggravated her symptoms; and that stomping and straight leg raises aggravated her left knee symptoms. [R356-57]. She was advised to undergo a two-month course of physical therapy and home exercises for her low back pain. [R357]. Plaintiff reported in November 2012 that she was unable to continue physical therapy due to cost. [R398].

An October 16, 2012 MRI of Plaintiff's cervical spine revealed moderate to severe multilevel degenerative disease at C4-C5, C5-C6, and C6 levels. [R571]. At her November 14, 2012 annual physical, Plaintiff stated she wanted to see a disability

---

[10]     Hypomobile is defined as being capable of a smaller range or frequency of movement than normal. https://www.merriam-webster.com/medical/hypomobile (last visited 9/22/17).

14

doctor because she was seeking to obtain disability for her neck and leg pain, although she was assessed without pain or mechanical limitation. [R398]. She was diagnosed with hypothyroidism.[11] [R399]. It was also noted that she had hypertension for which she was taking medication. [R400].

On November 19, 2012, Plaintiff underwent an electromyogram and nerve conduction study of her bilateral hands and was diagnosed with numbness and tingling of skin. [R360-61]. However, Plaintiff could not tolerate nerve conduction or concentric needle examination studies in her upper right extremities, so the study was discontinued and the facility was unable to exclude cervical radiculopathy or median neuropathy. [R362].

Earlier in November 2012, Plaintiff was assessed with osteoarthritis of the knee and strength of a three out of five in her right leg. [R399-400]. However, an examination showed normal gait and range of motions in the joints without pain or mechanical limitation. [*Id.*].

---

[11] Hypothyroidism is a condition in which the body lacks sufficient thyroid hormone. Since the main purpose of thyroid hormone is to "run the body's metabolism," it is understandable that people with this condition will have symptoms associated with a slow metabolism. https://www.endocrineweb.com/conditions/thyroid/hypothyroidism-too-little-thyroid-hormone (last visited 09/25/17).

AO 72A
(Rev.8/8
2)

At a January 31, 2013 initial evaluation at Peachtree Orthopaedic Clinic by Dr. Langenbeck, Plaintiff alleged neck pain for two years with no preceding event, reporting that therapeutic exercises were not helping her spine and describing her pain as an eight out of ten. [R367]. A physical exam revealed full range of motion in shoulders, elbows, and wrists, little difficulty with extension of cervical spine, and some mild tenderness in the cervical paravertebral musculature. [*Id.*]. Her right bicep reflexes were rated at a two out of four, her left triceps were a one out of four, and a motor exam showed strength at five out of five. [*Id.*]. An MRI of Plaintiff's cervical spine showed disk osteophyte complex at C6-7 and to a lesser degree at C4-5 and C5-6. [R367]. Dr. Langenbeck advised that Plaintiff had mild-to-moderate degenerative changes in the cervical spine that he described as common at her age, but that a bone spur was affecting the C6-7 level. He prescribed epidural steroid injections of her cervical spine at C6-7. [R368].

On June 11, 2013, Plaintiff went to Kaiser for an epidural. She claimed that she was experiencing bilateral neck and shoulder pain of nine out of ten, that was sharp, tingling, radiating to the shoulder, worse in the afternoon, and aggravated by lying and sitting and alleviated by standing. [R370]. She described the pain as not occurring in the past. [*Id.*]. MRI images of her cervical spine revealed moderate to severe

16

multilevel degenerative disc disease most pronounced at the C4-C5, C5-C6, and C6 levels and thyromegaly. [R371]. She was assessed with cervical disc degeneration and spinal stenosis, advised to exercise, and prescribed a single epidural cervical injection which she could not undergo that day because she needed sedation. [R372].

On August 26, 2013, Plaintiff reported that her lower back pain was not well controlled at a pain level of a five out of ten. [R585]. An MRI revealed moderate to severe arthritis in her lumbar back, [R573], and a September 11, 2013 MRI revealed moderate to severe degenerative disease at L4-L5. [R574].[12] Treatment records from Kaiser reflect that Plaintiff received epidural injections of Kenalog[13] and Midazolam[14]

---

[12] These records were submitted after the hearing before the ALJ. [R54]. However, the ALJ kept the record open after the hearing date to allow for the submission of additional medical records. [R34]. Accordingly, the ALJ considered these records in his decision.

[13] Kenalog (triamcinolone acetonide) is a corticosteroid hormone (glucocorticoid) that decreases the body's immune response to these diseases and reduces symptoms such as swelling. It is used in a variety of conditions such as allergic disorders, arthritis, blood diseases, breathing problems, certain cancers, eye diseases, intestinal disorders, collagen and skin diseases. http://www.webmd.com/drugs/2/drug-9275/kenalog-injection/details (last visited 9/25/17).

[14] Midazolam belongs to a class of medications called benzodiazepines, which produce a calming effect on the brain and nerves (central nervous system). It is thought to work by increasing the effect of a certain natural chemical (GABA) in the brain. http://www.webmd.com/drugs/2/drug-16685/midazolam-oral/details (last visited

AO 72A (Rev.8/82)

on January 15, 2014. [R689-90].[15] On February 26, 2014, treatment notes by Dr. Vick-Bone of Kaiser indicated that she "has undergone 4 procedures in the last year, 3 cervical epidurals with short term relief. She still notes neck and arm pain. . . . Her back and leg symptoms are stable. Her neck and arm are the most bothersome and limiting." [R731]. Dr. Vick-Bone noted that she would "refer for surgical evaluation and consideration" and "order a new cervical epidural." [*Id.*].

An April 9, 2014 MRI of Plaintiff's cervical spine showed thyromegaly and stable multilevel degenerative disc disease most pronounced at C5-6 and C6-7. [R716].

### 4.    *Mental Health Treatment Records*

On November 29, 2012, Plaintiff began mental health treatment at Kaiser. [R515]. She reported that she had been having back and neck pain, was on disability for a year, but was not doing well; she reported that she felt depressed and started drinking again after being sober for six months. [*Id.*]. She reported drinking two (and sometimes three) forty-ounce beers a day, about a pint of vodka on Saturdays and Sundays, using about a quarter teaspoon of cocaine on weekends, and smoking

---

9/25/17).

[15]    These records, and those cited in this entire paragraph, were not before the ALJ but were presented to the Appeals Council. [R13 (citing Exs. 18B, 20E, 21E, 22E, 18F)].

AO 72A
(Rev.8/8
2)

marijuana about once a month. [*Id.*]. She stated that she has tried to stop, but can only last for two days. [*Id.*]. She was assessed with major depression, PTSD, generalized anxiety disorder ("GAD"), alcohol dependence, and a GAF score of 40.[16] [R518-19]. She was prescribed Celexa,[17] Trazadone, and psychotherapy. [R519].

Plaintiff continued a course of treatment with Kaiser and, although she consistently denied suicidal ideation, [R479, 483, 491, 495, 498, 500-501, 509], in February 2013, she reported passive suicidal ideation for two or three days when she did not attend group therapy and had not refilled her medication, [R509]. On March 18, 2013, she again reported that she had run out of her medications four days prior and needed a refill, [R503], and was assessed with a GAF score of 55, [R506].[18]

---

[16]     The GAF is a numeric scale (0 through 100) that considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision, 2000) ("DSM-IV-TR"). A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."

[17]     Celexa is the same as citalopram. *See* n.6.

[18]     A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or

AO 72A
(Rev.8/8
2)

In May 2013, Plaintiff's GAF score remained at 55 and her mental health provider noted that she "seems to have many activities and functions" including taking care of her granddaughter a couple of times a week (whom she had brought to her appointment that day) and baking with her. [R498].

In June 2013, Plaintiff reported that she ran out of medication because she could not afford it. [R485]. She was assessed with a GAF score of 50.[19] [R488]. However, in July 2013, after compliance with medication, Plaintiff was assessed with moderate depression and a GAF score of 58. [R525]. Plaintiff was assessed with a GAF score of 53 on October 28, 2013 and, again, in November 11, 2013, after she acknowledged that she had used marijuana, was concerned about moving due to increased rent, and had not been able to go to her 12-step group due to transportation issues. [R629-30].

Plaintiff missed her next two appointments–due to forgetting and transportation issues–and was seen again on December 16, 2013. [R649]. On June 30, 2014, Plaintiff

_____

co-workers)." DSM-IV-TR at 34.

[19] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g.. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-TR-IV at 34.

AO 72A
(Rev.8/8
2)

reported that she had not been going to meetings because she did not have transportation. [R697, 700].

### D. Vocational-Expert Testimony

The Vocational Expert ("VE") testified at the hearing before the ALJ that Plaintiff's past work as a shuttle, school, and transit bus driver and as a babysitter are classified under the DOT as medium, semi-skilled work, and her work as a courier-delivery driver was classified as light, unskilled work. [R89]. The VE testified that the only transferable skills Plaintiff acquired were driving and operating vehicles. [*Id.*]. The VE testified that other jobs similar to the light, semi-skilled, courier-delivery driver job were private chauffeur, commercial chauffeur, and car rental deliverer. [R89-90]. The VE testified that full-time competitive employment would be precluded if a person were incapable of sitting, standing, and/or walking in some kind of combination for at least eight hours. [R90]. The VE further testified that Plaintiff could not perform her past work as a driver or babysitter if she could lift or carry twenty pounds occasionally and lesser amounts more frequently but would need some kind of change of position between sitting, standing, and walking the way the job is typically performed, [*id.*], and that if Plaintiff was limited in activities that required constant turning and twisting of her head and neck, she would be precluded from driving jobs. [R93].

AO 72A
(Rev.8/8
2)

The VE testified that other, representative light, unskilled jobs that someone of Plaintiff's age, education, and her past relevant work could perform included cashier II, ticket seller, and public storage clerk or attendant. [R91-92]. The VE confirmed that Plaintiff would be precluded from these jobs if she was unable to carry over five pounds and could carry two pounds or less. [R92]. The VE testified that Plaintiff could perform the jobs of cashier, ticket seller, and public storage clerk or attendant if she had to shift and change positions between sitting and standing. [*Id.*]. The VE also testified that the use of an assistive device such as a cane, "would probably be precluded, require accommodation." [R94].

## IV. FINDINGS OF FACT

### A. ALJ's Findings of Fact

The ALJ made the following findings of fact:

1.   The claimant meets the insured status requirements of the SSA through June 30, 2014.

2.   The claimant has not engaged in substantial gainful activity since January 1, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.   The claimant has severe impairments of degenerative disc disease of the cervical spine, arthritis of the back, depression

22

AO 72A
(Rev.8/8
2)

and poly-substance abuse, by history (20 CFR 404.1520(c)).[20]

. . .

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

. . .

5. The claimant has the residual functional capacity to perform a range of light work as defined by 20 CFR § 404.1567(b).

. . .

6. The claimant is capable of performing past relevant work (20 CFR 404.1565).

---

[20] The ALJ did not find Plaintiff's hypothyroidism, hypertension, GERD, mild degenerative arthritis, and PTSD to be severe impairments. [R39]. He noted that although she complained of sluggishness from the hypothyroidism medicine, in her most recent appeal report she did not report any such side effects. He also noted that there was no objective medical evidence that she reported to her doctors that she experienced chest pain from her blood pressure medicine, and in any event, despite hypertension, she still smoked. The ALJ accorded substantial weight to the State agency physicians who concluded that her hypothyroidism and hypertension were not severe impairments. [*Id.*]. The ALJ also explained that there was little evidence associated with Plaintiff's complaints of GERD, but noted that she denied abdominal or flank pain, anorexia, nausea, vomiting, dysphagia, change in bowel habits, and unusual stools. [R39-40]. Further, while acknowledging that August 2012 x-rays of her lumbar spine and right knee showed mild degenerative arthritis, she did not require surgery for either, and although she claimed to have been prescribed a cane, there was no medical support for this device and she was noted to have a normal gait. [R40]. As for her PTSD, the ALJ remarked that although she was prescribed psychotropic medications, by July 2013, she stated that the medications were helpful and that she only had occasional PTSD panic attacks. [*Id.*].

AO 72A
(Rev.8/8
2)

. . .

7.     The claimant was not under a "disability," as defined in the
       SSA, from January 1, 2009 through the date of this decision
       (20 CFR 404.1520(g)).

[R39-48].

More specifically, the ALJ concluded that Plaintiff can occasionally lift and/or

carry twenty pounds, lesser amounts more frequently, and "requires a change of

position among sitting, standing, and/or walking the way the job is typically

performed"; and can perform simple, routine, repetitive tasks required in unskilled

work. [R41].

He found Plaintiff's "statements concerning the intensity, persistence and

limiting effects of these symptoms are less than fully credible," given her daily

activities, the treatment records, leading questions posed to her at the hearing by her

lawyer, and the lack of "any opinions, from either treating or examining physicians

indicating that [Plaintiff] is disabled or even has limitations greater than those" in the

RFC. [R42-45]. Specifically, the ALJ noted that Plaintiff (1) in her Exertional

Activities Questionnaire, stated that she climbed a flight of stairs at her doctor's office,

could carry a light load of laundry, dusted, made her bed, shopped, and walked daily

at the park; (2) baked with her four-year old granddaughter (who lived with her for

24

more than a year during the relevant period), babysat her granddaughter and took her to doctors appointments, concluding that "the care of a young child is demanding work both mentally and physically," and caring for her own daughter; (3) attended church services, attended poly-substance abuse meetings several times per week, drove a car, and resumed fishing (a hobby she had not engaged in since her husband died); (4) traveled between California, where she lived during part of the relevant time period, and Georgia; (5) took vacations in November or December 2011, for several weeks in April 2013, and was planning a trip to California for the holidays in December 2013; (6) planned to take GED classes at a church; (7) was fired from her last job; (8) could not get unemployment because she had not satisfied the duration-of-work requirement; and (9) had sought unemployment insurance and a job, which suggested that "she does not consider herself to be as functionally limited as she alleged" because "a condition for the receipt of unemployment compensation is the acknowledgment that one is ready, willing, and able to work." [R42-43].

The ALJ also observed that Plaintiff had a history of alcohol abuse and illicit drug use, with abuse in remission by self-report, noting that in 2013, she attended weekly meetings for alcohol and narcotics abuse, but thereafter tested positive for THC and cocaine and was advised to continue with a 12-Step Program. [R43].

25

He also noted that Plaintiff originally claimed to disabled due to a back problem and arm and hand numbness, but later added that her left hip had arthritis making it difficult to bathe, and her arm pain made combing her hair and cooking difficult, complaints that she repeated at the hearing. He also recounted that she claimed that she could not stand for more than thirty minutes and needed assistance to do household chores. [R43].

The ALJ then reviewed the medical evidence related, *inter alia*, to Plaintiff's complaints of musculoskeletal impairments. He noted that Plaintiff was inconsistent in her description of carpel tunnel syndrome surgery (bilateral wrist surgery in 1999 versus right-hand surgery in 2002). [R43]. He observed her report of an at least twenty year history of neck pain developed while driving a bus in 1997, with little treatment since 2000. [R43-44]. He recounted that her complaint of four months of hip pain as of September 2011, that was treated with Tramadol, Naprosyn, and Flexiril. [R44]. He noted that consultative doctors Robinson and James assessed her with normal range of motion in her back, shoulders, elbows, wrists, hips, knees, ankles, and feet, while Dr. James reported reduced active and passive extension and right lateral bending in the neck. The ALJ pointed out that both consultative doctors found normal grip and pinch strength and that Plaintiff had normal ambulation and did not need a cane, contrary to

26

Plaintiff's claim of little strength in her wrists and hands and that she recently had been prescribed a cane. [R43]. He also observed that Dr. James noted Plaintiff's lack of difficulty in undressing or getting on and off of the examination table, in assessing her with neck pain and multilevel degenerative disc disease of the cervical spine. [R43]. The ALJ further noted (1) that in August 2012, despite Plaintiff's claims of left hip, right knee, and lower back pain, x-rays of her hip were normal, and she was advised to apply heat and cold and avoid heavy lifting until better; (2) an October 2012 MRI revealed moderate to severe multilevel degenerative disc disease at C4-C5, C5-C6, and C6; (3) during her November 2012 physical she sought a referral to a pain doctor, advised that she was seeking disability due to neck and leg pain, was assessed with osteoarthritis of the knee, normal gait, 3/5 muscle strength in the right leg and hand, and normal range of motion; (4) in 2013, she complained of neck and right upper extremity pain for two years, an MRI showed a disk osteophyte complex at C5-7 and she was assessed with a disk osteophyte complex with a mild to moderate degenerative changes in her cervical spine, but examination showed little difficulty with extension, mild tenderness in the cervical paravertebral musculature, and full range of motion of the shoulders, elbows, and wrists, with normal motor strength of 5/5, [R44]; and (5) in June 2013, Kaiser assessed her with cervical disc degeneration and spinal stenosis, and

advised her to exercise and to have a cervical spine epidural, in August 2013 she complained of uncontrolled back pain but assessed it at five out of ten and was found to have a normal gait, and a September 2013 lumber spine MRI revealed moderate to severe degenerative disc disease at L4-L5 and x-rays of the cervical spine revealed multilevel degenerative disc disease. [R45].

The ALJ accorded "substantial weight" to the opinion of consultative examiner Dr. Robinson because it was "supported by the expertise, direct evaluation, and consistent with the medical evidence of record." [R45]. He gave "some weight" to the opinion of consultative examiner Dr. James "to the extent that it is consistent with the findings of Dr. Robinson" and the RFC, but "lesser weight" to her opinion that Plaintiff would be limited in her ability to do repetitive lifting, reaching, overhead work, and climbing and would be limited in activities that required constant turning and twisting of the head and neck," because the record reflected that Plaintiff (1) was able to drive as needed without any apparent limitation, (2) was not placed under any limitations by her treating physicians, and (3) she cared for "a young child independently for more than a year without any apparent difficulties." [R45-46]. He also gave some weight to the State agency physicians' reports. [R46]. The ALJ thus concluded that

AO 72A
(Rev.8/8
2)

> [a]lthough the claimant has degenerative disc disease of the cervical spine, she has been treated conservatively throughout the relevant period with medication, heat and cold, and injections. She has not required any surgical intervention. Despite arthritis of the back, treatment records reflected that she reported no more than five out often pain with medication. Notably, she has retained the functional ability to live independently, manage personal care and finances, shop, drive a car, and take care of a granddaughter who lived with her. The medical evidence supports a finding that the claimant is capable of light exertional work; however, her ability to perform the full range of such work has been reduced. Because of cervical spine degenerative disc disease and arthritis of the back, she requires work that allows for a change of position among sitting, standing, and walking and in the way that the job is typically performed.

[R46].

The ALJ also found that the VE testified that Plaintiff would be unable to perform past work as a school and shuttle bus driver and babysitter but could perform work as a courier delivery driver. [R47]. The ALJ held that, even if Plaintiff could not perform that past relevant work, the VE identified other jobs existing in significant numbers the national economy that she could perform given her RFC, age, education, and past work. [R47-48].

## B.  Appeals Council Findings of Fact

On appeal, the Appeals Council made the following findings of fact:

1.  The claimant met the special earnings requirements of the SSA on September 6, 2011, the date she stated she became

unable to work, through June 30, 2014. . . . The claimant has not engaged in substantial gainful activity since September 6, 2011.

2. The claimant has the following sever impairments: degenerative disc disease of the cervical spine; arthritis of the back; depression and poly-substance abuse by history, but does not have an impairment or combination of impairments that meets pr medically equals the listings in 20 CFR Part 404, Subpart P, Appendix 1.

3. The claimant's combination of impairments results in the following limitations on her ability to perform work-related activities: reduced range of light work, as defined by 20 CFR 404.1567(B), with additional limitations of required change of position among sitting, standing, and walking the way the job is typically performed and simple, routine, repetitive tasks required in unskilled work.

4. The claimant's subjective complaints are not fully credible for the reasons identified by the ALJ's decision.

5. The limitations in claimant's ability to perform work-related activities as set forth in finding 3 preclude the performance of past relevant work.

6. Transferability of work skills is not material to this decision because an individual of the Plaintiff's age, education, past relevant work (which is skilled or semi-skilled), with the RFC to perform a reduced range of light exertional work is found to be not disabled under the framework of Rule 202.14, Table No. 2 of 20 CFR Part 404, Subpart P, Appendix 2 of the SSA.

AO 72A
(Rev.8/8
2)

> 7.     The claimant is not disabled as defined under the SSA at any
>         time through the date of the ALJ's decision on May 16, 2014.

[R10-11].

## V.    *STANDARD FOR DETERMINING DISABILITY*

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits.

AO 72A
(Rev.8/8
2)

*See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform

32

other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id.*

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## VI.   SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner. Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact

33

resolved the crucial issues. *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as

AO 72A
(Rev.8/8
2)

unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

Also, a "court must consider evidence not submitted to the [ALJ] but considered by the Appeals Council when that court reviews the Commissioner's final decision." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1258 (11th Cir. 2007). In reviewing this additional evidence, the court must evaluate whether this "new evidence renders the denial of benefits erroneous." *Id.* at 1262. This means that the court must "determine whether the Appeals Council correctly decided that the '[ALJ's] action, findings, or conclusion is [not] contrary to the weight of the evidence currently of record.' " *Id.* at 1266-67 (quoting 20 C.F.R. § 404.970(b)).

35

# VII.   CLAIMS OF ERROR

## A.      Whether the RFC Was Impermissibly Vague

Plaintiff claims that the ALJ erred because he did not specify in the RFC how many hours in an eight-hour day she can sit, stand, or walk as required by SSR 96-8p.[21] [Doc. 10 at 6-8].   The Commissioner argues that the ALJ recognized Plaintiff's additional limitations by including in the RFC that Plaintiff needed to alternate sitting and standing and by securing testimony from a VE, as required by SSR 83-12, to clarify the implications for Plaintiff's occupational base.   [Doc. 11 at 10].   The Commissioner also argues that Plaintiff had an opportunity to cross-examine the VE to clarify these limitations, which Plaintiff's attorney did by asking if Plaintiff would be precluded from the jobs described by the VE if she had to "constantly" adjust position   "as

_____

[21]      Social Security Rulings " 'do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same.   A ruling may be superceded, modified, or revoked by later legislation, regulations, court decisions or rulings.' "   *Miller v. Comm'n of Soc. Sec.*, 246 Fed. Appx. 660, 662 (11th Cir. Aug 31, 2007) (alterations, citations, and some internal quotation marks omitted) (quoting *Heckler v. Edwards*, 465 U.S. 870, 874 n.3 (1984)).   Nevertheless, the Commissioner's interpretation of the Act (expressed through the SSR) is entitled to deference because it is a "reasonable and permissible interpretation of the provisions of the Social Security Act."   *Fair v. Shalala*, 37 F.3d 1466, 1469 (11th Cir. 1994).

AO 72A
(Rev.8/8
2)

required." [*Id.* at 11]. The VE responded that constant changing of positions would not preclude the jobs identified. [*Id.*].

In determining a claimant's exertional capacity, that is, an individual's limitations and restrictions of physical strength and the individual's remaining abilities to perform each of seven strength demands, the Commissioner's regulations require that

> Each function [(*i.e.*, sitting, standing, walking, lifting, carrying, pushing, and pulling)] must be considered separately . . . , even if the final RFC assessment will combine activities. . . .
>
> In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. . . .

SSR 96-8p, 1996 WL 374184, at *5-6.

Here, the ALJ did not discuss Plaintiff's ability to walk, sit, or stand except by stating that she "requires a change of position." [R41]. The Court recognizes that courts have held that such a separate, detailed discussion is not always necessary. *See Hendron v. Colvin*, 767 F.3d 951, 956-57 (10th Cir. 2014) (rejecting claimant's contention that the ALJ's "RFC is not in the proper form" because the ALJ did not "separately discuss and make findings regarding her abilities to sit, stand, walk, lift,

AO 72A
(Rev.8/8
2)

carry, push, or pull" (citing *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012) ("Where, as here, we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal. In conducting our review, we should, indeed must, exercise common sense. . . . [W]e cannot insist on technical perfection."))). The Court also recognizes that the VE testified that Plaintiff could perform the jobs he identified if she was allowed to change positions, and that given an opportunity to elicit more definitive testimony on cross-examination, Plaintiff's representative did not do so. However, with respect to Social Security administrative hearings before an ALJ, it is well established in the Eleventh Circuit that an ALJ has an affirmative duty to develop a full and fair record because administrative hearings are not adversary proceedings. *Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995); *Lucas v. Sullivan*, 918 F.2d 1567, 1573 (11th Cir.1990); *Smith v. Bowen*, 792 F.2d 1547, 1551 (11th Cir. 1986); *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). *But see Allen v. Schweiker*, 642 F.2d 799, 802 (5th Cir. 1981) (where

38

a disability claimant is represented before the agency, her representative has the power to present supporting evidence and challenge the testimony of the VE).[22]

Still, a "hypothetical question[ ] adequately account[s] for a claimant's limitations . . . when the question[ ] otherwise implicitly account[s] for the [ ] limitations." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011). Further, the ALJ's findings must be clear, concise, and unambiguous that the Court can engage in "meaningful . . . review of the ALJ's conclusion as to the level of work which [Plaintiff] could perform. . . ." *Maffia v. Comm'r of Soc. Sec.*, 291 Fed. Appx. 261, 265 (11th Cir. Aug. 28, 2008); *see also Miller v. Astrue*, Civil Action No. 1:08cv216-WC, 2009 WL 1664076 at *4-5 (M.D. Ala. June 15, 2009) (same). The Court concludes that this was not done in this case.

While the ALJ noted there was very little objective evidence concerning how Plaintiff's impairments were disabling or limited her abilities, [R45], that does not excuse the ALJ from performing the function-by-function assessment required by SSR 96-8p, considering that he found that certain of Plaintiff's musculoskeletal

---

[22]     In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

impairments were severe and required a reduce range of work so that she could switch positions.

The record is replete with evidence concerning Plaintiff's various activities that Plaintiff contended she could perform or not perform. For example, Plaintiff testified that these impairments affect her ability to stand for thirty minutes, [R68], allow her only to walk for an hour in an eight-hour day and sit for an hour and a half in an eight-hour day and sit continuously for one hour before she needs to get up, [R75], stoop, [R75], push and pull, [R81], bend and pick things up, [R71, 81], stand up, drive, or walk for long periods of time, [R73], impeded her sleep, [R78], walk more than ten or fifteen minutes before feeling pain, [R75], problems overhead reaching, [R76-77], grasp things because of tingles in her fingers and arthritis in her hands, [R77], and require her to elevate her legs because of her knee, [*id.*]. Although the ALJ need not accept all of Plaintiff's testimony with respect to her limitations, he must, nevertheless, "describe the maximum amount of each work-related activity [she] can perform based on the evidence available in the case record" for "[e]ach function [(*i.e.*, sitting, standing, walking, lifting, carrying, pushing, and pulling)] . . . separately . . ." SSR 96-8p. The ALJ's decision is not unambiguous enough to allow the Court to conduct meaningful review of the ALJ's conclusions. *Maffia*, 291 Fed. Appx. at 265.

AO 72A
(Rev.8/8
2)

Accordingly, the Court **REVERSES** the Commissioner's decision and **REMANDS** Plaintiff's case for further consideration of Plaintiff's RFC in light of the requirements of SSR 96-8p and to separately discuss the maximum amount of work-related activities that Plaintiff can perform given her alleged impairments. Moreover, the issues discussed above necessarily contribute to the ALJ's RFC determination and therefore to the content of the questions posed to the vocational expert. *See Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). Therefore, upon remand, the ALJ shall reconsider Plaintiff's RFC in light of the other findings consistent with this Order, and if necessary, shall pose to the VE complete hypothetical questions comprising all of Plaintiff's impairments. This conclusion obviates the need to analyze whether, as Plaintiff argues, [Doc. 10, at 12], the ALJ improperly relied upon the testimony of the VE that Plaintiff could perform other work in the national economy.

> **B.** **Whether the ALJ applied an inappropriate standard to evaluate Plaintiff's credibility concerning her subjective complaints of pain and limitations in her daily activities.**

The ALJ's evaluation of Plaintiff's credibility, however, is still ripe despite the Court's conclusion that the ALJ erred in not complying with SSR 96-8p. The ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are less than fully credible and credible only to the extent

41

they are consistent with the" RFC. [R42]. In so doing, the ALJ summarized Plaintiff's reported daily activities–including the fact that she has attempted to file for unemployment insurance, visited family in California, and cared for her granddaughter, [R42-33]–as well as objective medical evidence that was, at best, inconclusive, with respect to carpal tunnel syndrome, [R43], and lacked any opinions from treating or examining physicians indicating that her alleged impairments posed limitations, [R43-45]. Plaintiff claims that this was error by, essentially, claiming that the ALJ misconstrued the evidence concerning her daily activities. [Doc. 10 at 15-20].

The ALJ has discretion to make credibility determinations after listening to a claimant's testimony, "[b]ut the ALJ's discretionary power to determine the credibility of testimony is limited by his obligation to place on the record explicit and adequate reasons for rejecting that testimony." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). As a result, the credibility determination cannot be "a broad rejection which is 'not enough to enable [the court] to conclude that [the ALJ] considered [a plaintiff's] medical condition as a whole.' " *Dyer*, 395 F.3d at 1210 (quoting *Foote*, 67 F.3d at 1561). "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote*, 67 F.3d at 1562. If the ALJ fails to explain the reasons that he discredited a claimant's

AO 72A
(Rev.8/8
2)

testimony, the testimony must be accepted as true. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).

In evaluating whether a claimant is disabled based on her testimony regarding her pain or other subjective symptoms, the Eleventh Circuit evaluates whether there is: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson*, 284 F.3d at 1225 (citing *Holt*, 921 F.2d at 1223). The ALJ need not cite to the pain standard so long as "his findings and discussion indicate that the standard was applied." *Wilson*, 284 F.3d at 1225-26.

The pain standard "is designed to be a threshold determination made prior to considering the plaintiff's credibility." *Reliford v. Barnhart*, 444 F. Supp. 2d 1182, 1189 n.1 (N.D. Ala. 2006). Thus, "[i]f the pain standard is satisfied, the ALJ must consider the plaintiff's subjective complaints." *James v. Barnhart*, 261 F. Supp. 2d 1368, 1372 (S.D. Ala. 2003). When a claimant's subjective testimony is supported by medical evidence that satisfies the pain standard, he may be found disabled. *Holt*, 921 F.2d at 1223. If the ALJ determines, however, that a claimant's testimony is not credible, "the ALJ must show that the claimant's complaints are

43

inconsistent with his testimony and the medical record." *Rease v. Barnhart*, 422 F. Supp. 2d 1334, 1368 (N.D. Ga. 2006) (Feldman, M.J.). This credibility determination does not require the ALJ to cite to particular phrases or formulations, but it also cannot be a broad rejection so as to prevent the courts from determining whether the ALJ considered the claimant's medical condition as a whole. *Dyer*, 395 F.3d at 1210-11.

Even if the Court were to agree that the ALJ misconstrued the extent of Plaintiff's daily activities, the ALJ's credibility determination was not based on these alone; it was also based on an absence of objective medical findings. [R43-45]. The ALJ observed that, although Plaintiff complained of pain in her arms, shoulder, hands, back, hips, and legs, x-rays of her hips were normal and physical examinations consistently revealed normal range of motion, gait, extension, and strength. [R44-45]. The ALJ noted MRI and physical exam findings of cervical and lumbar issues, [*id.*], Plaintiff's mental health treatment records, and how she "consistently denied" suicidal ideation and "was frequently non-compliant" with medication, [R45]. The ALJ concluded by noting that there was no opinion evidence from treating or examining physicians indicating limitations greater than those encompassed within the RFC. [R45].

AO 72A
(Rev.8/8
2)

To evaluate the credibility of Plaintiff's subjective testimony regarding her pain, the ALJ must examine the medical evidence. *Holt*, 921 F.2d at 1223. Here, the ALJ did just that and determined that it was not wholly corroborative of Plaintiff's assertions regarding her limitations. As credibility determinations are within the ALJ's discretion this Court can only second-guess the ALJ's conclusions if he arrived at them via a deficient procedure. *Carnes v. Sullivan*, 936 F.2d 1215, 1219 (11th Cir. 1991). Here, because the ALJ articulated specific reasons for rejecting Plaintiff's credibility, he adhered to the procedural requirements of 20 CFR § 404.1529(c).

Accordingly, the Court finds no error in the ALJ's credibility determination.

## VIII. CONCLUSION

In conclusion, the undersigned United States Magistrate Judge **REVERSES** the final decision of the Commissioner and **REMANDS** Plaintiff's case to the Commission for further consideration of Plaintiff's claims, particularly the requirements of SSR 96-8p and its requirement that the ALJ separately discuss the maximum amount of work-related activities that Plaintiff can perform given her alleged impairments; and to reconsider Plaintiff's RFC in light of the other findings consistent with this Order, and if necessary, pose to the VE a complete hypothetical questions comprising all of Plaintiff's impairments.

AO 72A
(Rev.8/8
2)

The Clerk is **DIRECTED** to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED and DIRECTED**, this the 29th of September, 2017.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)